UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNATHAN PAK, M.D.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,<br><br>　　　　Defendant. | Case No. 21-cv-05032-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 54 |

Defendant Guardian Life Insurance Company of America ("Guardian") moves for summary judgment of two claims brought by defendant Johnathan Pak, who alleges that Guardian breached their insurance contract and the covenant of good faith and fair dealing when it denied Pak total disability benefits, awarding residual benefits instead. Pak, who now concedes that his occupation at the time of his disability was both general and pediatric anesthesiology, has proffered sufficient evidence showing a genuine dispute of material fact over whether he was able to perform the substantial and material duties of his occupation in the usual and customary manner with relative continuity. Guardian's motion is therefore with respect to the breach of contract claim. But it is GRANTED on the breach of good faith claim and on Pak's request for punitive damages. There is a genuine dispute over whether Pak was totally disabled, as shown by the evidence submitted on the breach of contract claim. Pak attempts to create a genuine dispute of material fact where none exists; the record shows that Guardian considered the evidence that he claims was ignored and portrayed it accurately. And any delay in the determination of Pak's claim was reasonable given the nature of the (still ongoing) dispute. As the only remaining claim is for breach of contract, Pak has no claim for punitive damages.

# BACKGROUND

Between 2003 and 2008, Pak, an anesthesiologist, purchased four disability insurance policies ("the policies") from Guardian. Mot. for Summ. J. ("MSJ") [Dkt. No. 54] 2:18-20 (citing Kelly Decl. ¶ 4); Oppo. [Dkt. No. 55] 1:22-25 (citing Pak Decl. ¶ 2). The policies provide for benefit payments of approximately $15,000 per month if Pak became "totally disabled," and other benefits if he became "residually disabled." *See* MSJ at 2:22-25; Oppo. at 1:25-2:10. The policies define those terms as follows:

> **Total Disability**
>
> Until we have paid benefits for five years in the same claim, total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation.
>
> After that in the same claim, total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation and you are not at work in any occupation.
>
> Your occupation means the regular occupation (or occupations, if more than one) in which you are engaged at the time you become disabled.
>
> If your occupation is limited to a single medical specialty certified by the American Board of Medical Specialties . . . we will deem your specialty to be your occupation.
>
> . . .
>
> **Residual disability** means that you are at work and are not totally disabled under the terms of this policy but, because of sickness or injury your loss of income is at least 20% of your prior income.

*See, e.g.*, MSJ, Kelly Decl., Ex. 1 at 2533, 2539; Oppo., Pak Decl., Ex. A at 9, 14.

In August 2018, Pak began experiencing severe migraine headaches that caused him significant pain, blurred vision, and dizziness, disrupted his sleep, and left him sensitive to light and sound, among other symptoms. MSJ at 1:3-5; Oppo. at 3:23-26 (citing Pak Decl. ¶ 9). On July 23, 2019, he filed a disability claim with Guardian stating that he had worked in a reduced capacity because of "chronic migraine headaches with severe blurriness, vision disturbances, nausea, light and sound sensitivity [and] major sleep deprivation." *See* Oppo., Pak Decl., Ex. C at 4-5. He stated his occupation as "pediatric and general anesthesiologist," listing his occupational

duties as "pediatric anesthesia, general anesthesia, patient care, pediatric care consults [and] overnight on-call." *Id*. at 7-8. He also submitted a statement from his neurologist, Dr. Noor Sachdev, who confirmed that Pak had been diagnosed with chronic migraines and recommended that he reduce his work activities but not that he stop working altogether. *Id*. at 11-12.

Guardian investigated Pak's claim over the next several months, requesting information such as billing records, financial information, and a list of procedures that Pak was no longer performing. MSJ at 4:9-13 (citing Kelly Decl., Ex. 4). Pak also submitted progress reports updating Guardian on his condition and ability to work. *See, e.g., id*., Kelly Decl., Ex. 6. On December 4, 2019, Pak informed Guardian that he had relinquished his pediatric anesthesiology responsibilities but continued to work as a general anesthesiologist "while minimizing [his] calls." *Id*. He later submitted letters from current and former employers stating he was no longer practicing pediatric anesthesiology. *Id*., Ex. 7. In February 2020, Pak told Guardian he was "no longer performing pediatric cases under the age of 12." *Id*., Ex. 8.

On February 25, 2020, Guardian issued Pak a $41,575.16 check. *Id*., Ex. 9. In a letter sent to Pak's attorney on March 5, 2020, Guardian explained that this was a residual disability payment but that its investigation into Pak's eligibility for total disability benefits was ongoing. *Id*.

On July 2, 2020—after a back-and-forth between the parties over the nature of Pak's pre- and post-disability work—Guardian denied Pak's total disability claim. *See id*., Ex. 16. In its letter to Pak, Guardian stated that its analysis of the work he performed (captured by "ASA/CPT codes"), medical records, progress reports, and financial information showed that he was not eligible for total disability benefits. *Id*. Guardian also stated that: (1) it disagreed with Pak that his pre-disability occupation was limited to pediatric anesthesiology; and (2) the evidence did not support that his condition only restricted or limited his ability to work on pediatric patients while still allowing for the safe performance of general anesthesiology. *See id*.

On October 15, 2020, Pak sued Guardian in the California Superior Court for the City and County of San Francisco for breaches of contract and the covenant of good faith and fair dealing, arising out of its denial of his total disability claim. Dkt. No. 1. Guardian removed the case to this court in June 2021. *Id*. It filed this motion for summary judgment on June 15, 2022, which I

1  heard on July 20.  Dkt. No. 54.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324.  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I.  BREACH OF CONTRACT

Pak's breach of contract claim turns on whether he was totally disabled, as he asserts, or residually disabled, as Guardian determined.  Under California law, an insured is totally disabled if he is unable to perform the substantial and material duties of his own occupation in the usual and customary way with reasonable continuity. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1006 (9th Cir. 2004) (upholding jury instruction based on *Erreca v. W. States Life Ins. Co.*, 19 Cal. 2d 388 (1942)).  "Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business." *Erreca*, 19 Cal. 2d at 396.

"Conversely, the insured is not totally disabled if he is physically and mentally capable of performing a substantial portion of the work connected with his employment." *Id*. An insured claiming benefits has the burden of proving that he is entitled to coverage under the policy. *Argenal v. Reassure Am. Life Ins. Co.*, No. 13-01947-CRB, 2014 WL 1678008, at *5 (N.D. Cal. Apr. 28, 2014) (citations omitted).

### A. Pak's Pre-Disability Occupation

In order to determine the substantial and material duties of Pak's occupation, I must first determine what his pre-disability occupation was. This "turns on his work at the time of his disability." *See* Order Denying Mot. for Partial Summ. J. ("First MSJ Order") [Dkt. No. 41] 7:7-9; *see also Gross v. UnumProvident Life Ins. Co.*, 319 F. Supp. 2d 1129, 1143 (C.D. Cal. 2004) ("[W]hat matters is the occupation in which plaintiff was engaged at the time he became disabled, not the occupation in which he was board-certified or what occupation he might have practiced at the time he purchased the insurance policy.").

Pak previously filed a motion for partial summary judgment to determine whether his pre-disability occupation, as defined by the policies, was pediatric anesthesiology. *See* First MSJ Order at 1:15-17. I held that per the policy language, his occupation was that of a pediatric anesthesiologist if he limited his work to that specialty at the time of his disability, but that Guardian had shown a dispute of material fact whether Pak so limited his work. *Id*. at 8:2-5. Guardian's primary argument was that the majority of Pak's work at the time of his disability was related to general, not pediatric, anesthesiology, meaning that he worked as a pediatric *and* general anesthesiologist at the time of his disability. *See id*. at 8:13-22.

Guardian raises the same argument on this motion for summary judgment: that Pak performed both general and pediatric anesthesiology, with the majority of his work focused on the former. *See* MSJ at 14:20-25. Pak responds that he "disagrees," but that given my prior ruling that there was a genuine dispute of material fact over his pre-disability occupation, he "does not believe it is necessary or productive to repeat the arguments." *See* Oppo. at 7 n.4. Pak further states that "[f]or purposes of this motion," he "agrees that his regular, pre-disability occupation was both pediatric and general anesthesiology." *Id*.

5

"The denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing." *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014). This makes sense. "Denial of summary judgment may result from a factual dispute at the time," one that "may disappear as the record develops." *Id*.

Guardian again submits evidence that Pak did not limit his pre-disability work to pediatric anesthesiology, including Pak's claim (which describes his occupation as a "pediatric and general anesthesiologist" and lists both pediatric anesthesia and general anesthesia as his occupational duties) and an analysis of ASA/CPT codes showing that approximately 93 percent of Pak's pre-disability time and revenue derived from procedures performed on patients aged 12 and over. *See* MSJ, Kelly Decl., Ex. 2 at 7-8 (claim form), Ex. 14 (ASA/CPT codes).[1] In addition, it now offers an expert report stating that those codes "capture the vast majority" of the major duties that Pak previously argued were not reflected by the codes (including pediatric consults and pediatric surgery consults). *Id.*, Novak Decl., Ex. 24 at 6-7.

Pak does not argue that his pre-disability occupation was both pediatric and general anesthesiology, let alone offer any evidence to counter Guardian's. Accordingly, I find that Pak's occupation at the time of his disability was both pediatric and general anesthesiology.

**B. Pak's Ability to Perform the Substantial and Material Duties of His Occupation**

The question is whether there is any genuine dispute of material fact over whether Pak is able to perform the substantial and material duties of a general *and* pediatric anesthesiologist, in the usual and customary way with reasonable continuity.

### 1. General Anesthesiology

Guardian first argues that Pak continues to practice general anesthesiology because he "has continued to perform the same types of procedures, maintained his production, and increased his average monthly charges" after his disability. MSJ at 16:12-16. In support, it primarily relies on an expert witness report evaluating Pak's billing units and charges pre- and post-disability. *See id.* at 15:12-16:11 (citing Smith Decl., Ex. 25 ("Smith Report") at 10-11). The report analyzed

---

[1] Guardian initially filed an illegible version of Exhibit 2 with its motion for summary judgment. *See* Dkt. No. 54-1. It filed an errata with a legible version, which can be found at Docket No. 58.

6

certain productivity metrics, including "base unit values" (which are "used for establishing fee schedule allowances" and "take into account the complexity, risk, and skill required to perform the service") and "charges billed" (which "represent the physician's fee/charge submitted to the payer for reimbursement"). Smith Report at 10. The report shows that 80 percent of Pak's pre-disability base units were billed for anesthesia and 16 percent for surgery. *Id*. Post-disability, 83 percent of base units were billed for anesthesia, and 10 percent for surgery. *Id*. The report also shows that 89 percent of Pak's pre-disability charges billed were for anesthesia and 9 percent for surgery. *Id*. at 12. Post-disability, the percent of charges billed for anesthesia remained the same, while that for surgery dropped to 6 percent. *Id*.

Moreover, Guardian argues, the report shows that Pak's "total production has remained steady as well." MSJ at 16:1-2. Pak averaged 506.70 base units billed monthly pre-disability, which dropped to 491.78 post-disability (including a nearly 32 percent decrease in 2020, during the beginning of the COVID-19 pandemic). Smith Report at 10. And, Guardian notes, the report shows that Pak's monthly average charges billed increased pre- to post-disability, from almost $145,463 to nearly $175,462. MSJ at 16:5-11 (citing Smith Report at 12).

Guardian concedes that another memo analyzing Pak's pre- and post-disability ASA/CPT codes shows that he "currently performs fewer longer/complex cases and more outpatient procedures," but contends that it also shows that he "is still performing all of the same procedures that he performed pre-disability and earning significant revenue from those procedures." MSJ at 15:20-22 (citing Kelly Decl., Ex. 17).

Pak responds by challenging the credibility of Guardian's analysis and by submitting evidence that he argues shows he no longer performs the substantial and material duties of general anesthesia. *See* Oppo. at 11:23-13:28. First, he contends that the ASA/CPT codes "do not demonstrate the true volume and nature" of his work, as they do not provide data on certain duties performed (including, among others, his on-call hours) and because his former employer underreported several categories (including base units and charges billed) so the "pre-disability production data is lower than it should be." *Id*. at 12:34-21. In support, he cites his own declaration and a letter from his attorney to Guardian including a summary of Pak's codes

showing a decrease in anesthesia units. *See* Oppo., Pak Decl. ¶¶ 21, 24; Bourhis Decl., Ex. S. Pak also argues that the codes "fail to capture the nature and complexity" of the procedures performed, which are instead gleaned from separate anesthesia records. *See id.* at 13:3-11. He points to the deposition of Henry Kamali, Pak's current boss, who testified that in order to determine the type of procedures Pak was performing, one "would have to look at the anesthesia records" because "[y]ou can't get all the information you need from a CPT code." *See id.* (citing Bourhis Decl., Ex. AA ("Kamali Depo.") at 94:21-95:22).

Moreover, Pak asserts that after his disability, his practice group moved him to primarily outpatient procedures that are "shorter, simpler, and require less skill," meaning that he now performs a higher volume of cases than he did pre-disability, when he worked inpatient cases that were longer and more complex. *See id.* at 12:22-27 (citing in part Pak Decl. ¶ 16; Kamali Depo. at 60:21-61:14; Bourhis Decl., Ex. S). Due to that higher case turnover, he says, the ASA/CPT codes "show higher base units and billed charges." *Id.* at 12:27-28.

Finally, Pak proffers additional evidence—his declaration and deposition—stating that after his disability, he no longer works night or weekend on-call shifts, and only performs daytime on-call duties when another general anesthesiologist is on standby to support him in case he suffers a headache. *Id.* at 11:23-12:9 (citing in part Pak Decl. ¶ 16). He also no longer works obstetrics cases. *See id.* (citing in part Bourhis Decl., Ex. Y ("Pak Depo.") at 416:15-417:2). According to Pak, before his disability he worked these on-call shifts on his own, and on obstetrics cases. *See* Pak Decl. ¶ 16.

Pak has met his burden on summary judgment, showing that there is a genuine dispute of material fact over whether he is able to perform the substantial and material duties of a general anesthesiologist. He has submitted affirmative evidence from which a jury could return a verdict in his favor, including his own testimony about his pre-disability work and current caseload. He also offered evidence attacking the credibility of Guardian's analysis of the ASA/CPT codes—the primary evidence it relies upon in arguing that Pak still performs a general anesthesiologist's substantial and material duties. Similarly, Guardian challenges some of Pak's evidence—namely, his own declaration, which it describes as "conclusory" and "self-serving." *See* Reply [Dkt. No.

1   57] 4:8.  But the jury will have to weigh the evidence submitted by both sides and determine the

2   credibility of that evidence.  The question of whether Pak is able to perform the substantial and

3   material duties of a general anesthesiologist cannot be answered as a matter of law.

4           This finding is further supported when considering the rest of the definition of "totally

5   disabled" under California law.  At the least, Pak has proffered evidence showing that he cannot

6   perform the substantial and material duties of a general anesthesiologist in the usual or customary

7   manner.  Pak returns to his deposition and declaration, where he testified that he now primarily

8   performs less complex outpatient work, cannot practice on his own, only works part-time (and

9   without night or weekend on-call shifts), and no longer takes obstetrics cases.  *See* Oppo. at 14:6-

10  21 (citing in part Pak Decl. ¶ 16).  In addition, Pak cites testimony from his boss, who stated that

11  Pak "basically functions as a glorified nurse."  *Id*. at 14:22-26 (citing in part Kamali Depo. at

12  91:14-92:15).  Kamali also testified that his practice tries to ensure that Pak is "doing kind of the

13  light work, so to speak" and performing "easy cases."  Kamali Depo. at 58:4-9, 60:25-61:11.

14          Similarly, Pak offers evidence showing that he cannot perform the substantial and material

15  duties of a general anesthesiologist with reasonable continuity.  *See* Oppo. at 15:3-10.  That

16  evidence again includes his declaration, where he stated that "[g]iven the unpredictable nature of

17  [his] attacks," his work schedule is "sporadic," and he frequently rearranges it and asks colleagues

18  to cover for him.  Pak Decl. ¶ 16.  It also includes additional testimony from Kamali, who stated in

19  his deposition that Pak "takes a lot of time off because he has got to get medical treatments and

20  when his migraines flare up, he can't work."  Kamali Depo. at 74:8-15.

21          Guardian does not squarely address either point in its motion or reply.  *See generally* MSJ;

22  *see also* Reply.  At most, it challenges Pak's statement that he cannot work in the usual and

23  customary way because another anesthesiologist must be on standby.  Reply at 5:11-18.

24  According to Guardian, Pak never raised this during its review of his claim, his physicians did not

25  recommend having another anesthesiologist on standby, and he testified that he only needed a

26  standby anesthesiologist for pediatric cases.  *See id*.  Such arguments require the weighing of

27  evidence and determinations of credibility—a job for the jury, not the judge.

28          Taking all of this into account, Pak has shown that a genuine dispute of material fact exists

United States District Court
Northern District of California

9

as to whether he is able to perform the substantial and material duties of a general anesthesiologist in the usual or customary manner with reasonable continuity. Therefore, there is a genuine dispute of material fact over whether Pak was totally disabled. Summary judgment is inappropriate on the breach of contract claim.

### 2. Pediatric Anesthesia

Next, Guardian contends that Pak continues to practice pediatric anesthesiology and thus, is not totally disabled. MSJ at 16:17-17:8. Its argument boils down to two primary points: first, that Pak is not "completely incapable" of anesthetizing children aged 12 and under (as he has asserted), and second, even if he were, because he still anesthetizes patients aged 13 to 18, he still performs pediatric anesthesiology. *See id.* at 17:5-8.

Regarding the first set of patients, Guardian argues that when Pak withdrew his staff privileges to treat patients aged 12 and under, he did so voluntarily—not because his treating physicians advised him to. *Id.* at 17:17-18:2. Rather, Guardian contends, one physician (Dr. Sachdev) recommended only that Pak reduce his work hours and improve his sleep by limiting night on-call shifts, and said that he would defer to Pak's judgment about performing pediatric anesthesia. *See* MSJ at 17:19-22 (citing in part Collins Decl., Ex. 18 ("Pak Depo.") at 193:12-195:7, 211:17-213:13). According to Guardian, another physician (Dr. Harjasleen Walia) opined that Pak should not "engage in his duties as an anesthesiologist when he is experiencing cluster headaches," but did not otherwise restrict his work. *See id.* at 17:22-25 (citing in part Pak Depo. at 293:12-17).

Guardian further contends that there is no medical evidence supporting Pak's assertion that he cannot safely administer anesthesia to patients aged 12 and under but can safely do so to those aged 13 and older. *Id.* at 18:3-6. In support, it points in part to testimony from Pak and Kamali that a patient's age is not a bright-line determinative but that anesthesiologists also consider whether an older patient (i.e., one older than 12) has any comorbidities that warrant classifying her as a pediatric patient instead. *See id.* at 18:6-28; Pak Depo. at 167:15-168:20, 224:19-226:5 ("[W]e can't always go by chronological age. . . . The hospital says 12 years and under; however, it doesn't always apply in actual practice. Because as we mentioned, people could be

10

1  physiologically underdeveloped or they could be overdeveloped, given a certain chronological
2  age."); Collins Decl., Ex. 20 ("Kamali Depo.") at 53:8-54:10 ("The age is not the sole
3  determinant.").

4  Even if Pak were unable to administer anesthesia on patients aged 12 and under, Guardian
5  argues that because he did not withdraw his privileges for children aged 13 to 18 and continues to
6  treat patients within that age range, he is still practicing pediatric anesthesiology. MSJ at 16:18-24
7  (citing Kelly Decl., Ex. 14) (showing units charged post-disability for patients over the age of 12).
8  In support, it cites evidence including its medical expert's report, Pak's claimant statement, and
9  Pak's deposition testimony, all of which state that pediatric patients are those under the age of 18.
10 *See id.* at 16:24-17:5; Novak Decl., Ex. 24 at 8 ("If Dr. Pak is still anesthetizing patients from age
11 13-18, he is continuing to practice pediatric anesthesiology."); Kelly Decl., Ex. 2 ("Pediatric
12 Anesthesia: Treating children under the age of 18"); Pak Depo. at 52:22-23 ("Pediatric patients go
13 to the age of 18").

14 Pak responds that he is totally disabled from practicing pediatric anesthesiology because,
15 in addition to no longer treating patients aged 12 and under, he is no longer treating those aged 13
16 to 18 who are classified as pediatric. Oppo. at 8:8-26. He too submits evidence—his and
17 Kamali's depositions—that a patient between the ages of 13 and 18 may still be classified as
18 pediatric depending on factors such as comorbidities, physical size, and mental development. *See*
19 *id*. (citing Kamali Depo. at 49:5-16, 51:2-19, 53:8-54:10; Pak Depo. at 167:15-168:20, 229:6-21).
20 According to Pak, he no longer treats such patients. Pak Decl. ¶ 11. Therefore, he argues, "he no
21 longer practices any pediatric anesthesia." Oppo. at 8:25-26.

22 Importantly, Pak also proffers evidence—letters from his current and former employers,
23 his own testimony, and Kamali's deposition—stating that he is no longer able to anesthetize
24 pediatric patients because of his headaches and the skill level involved in pediatric anesthesiology.
25 *See id*. at 7:12-22 (citing in part Bourhis Decl., Exs. C, D; Kamali Depo. at 50:4-16; Pak Decl. ¶¶
26 11-14). In addition, he points to a letter from Dr. Sachdev, who restricted Pak from interrupted
27 sleep and "stressful situations requiring increased concentration," and wrote that "[l]imiting hours
28 of work according to Dr. Pak's comfort level would be best to prevent worsening of his condition

11

and remain efficacious in his work environment." *See id*. at 9:1-14 (citing in part Bourhis Decl., Ex I). Another letter from Dr. Walia described how cluster headaches "may inhibit Dr. Pak's clinical judgment" and that "during an attack he may be unable to perform clinic duties, such as writing an order but certainly would be unable to intubate a patient." *See id*. at 9:24-10:10 (citing Bourhis Decl., Ex. U).

Taken together, Pak contends, this evidence shows that he is unable to perform the substantial and material duties of pediatric anesthesiology. *See* Oppo. at 11:4-5. And because he cannot perform pediatric anesthesiology at all, he argues, he cannot do so in the usual and customary manner or with reasonable continuity. *See id*. at 11:6-19.

The evidence Pak submits regarding his ability to practice pediatric anesthesiology is less convincing than that for his ability to practice general anesthesiology. But it is not the court's role to weigh evidence on summary judgment. Instead, I must look to the record to see if Pak has shown a genuine dispute of material fact from which a jury could decide in his favor.

Pak has shown a genuine dispute of material fact over his ability to practice the substantial and material duties of pediatric anesthesiology—and thus, a dispute of material fact over whether he is totally disabled. Pak and his employers have stated that he is no longer able to safely anesthetize pediatric patients, given the complexity of such cases and skill level required. His doctors advised certain restrictions to his work that, at the least, indicate that he is not able to work in the usual and customary manner with reasonable continuity. And Pak contends that he no longer treats pediatric patients of any kind, including those over the age of 12 classified as such because of other factors. The differing definitions of what constitutes "pediatric anesthesiology," like the other evidence presented, are for a jury to consider.

Summary judgment on the breach of contract claim is DENIED.

## II. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007). This does not obligate an insurance company to pay every claim an insured makes. *Id*. Rather, "an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial

or delay was unreasonable." *Id*. at 723.

Under California law, the general rule is that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *See id*. (citation omitted). A legitimate dispute over whether facts trigger the insurance coverage is one example of such a dispute. *See id*. But the genuine dispute rule is not absolute. It "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process, and evaluate the insured's claim." *Id*. "A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Id*. (emphasis in original).

There is a legitimate dispute over whether the facts show that Pak was totally, rather than residually, disabled. To avoid summary judgment on his good faith claim, Pak must therefore show a genuine dispute of material fact over whether Guardian's investigation was unreasonable, unfair, or not thorough.

Pak argues that Guardian acted unreasonably in a number of ways, including by: ignoring the opinions of his treating physicians and employers; mispresenting his physicians' opinions; improperly focusing on flawed ASA/CPT codes; and delaying its decision on Pak's claim. *See* Oppo. at 19:7-29, 21:12-22:3.

Pak attempts to manufacture a genuine dispute of material fact about the investigation's sufficiency where none exists. Indeed, much of the evidence he cites undercuts his argument. For example: he accuses Guardian of ignoring the opinions of his physicians and employers, who he asserts "unequivocally support his total disability claim." *Id*. at 18:26-28. But the two letters from his employers state only that Pak was no longer practicing pediatric anesthesiology—not that he was no longer practicing general anesthesiology. *See id*., Bourhis Decl., Exs. C, D. Not only does Pak mispresent the content of the letters, he submits no evidence that they were in fact ignored.[2]

---

[2] Pak points to the deposition of Guardian's claim representative, who testified that he "made no mention" of the statements of Pak's employers in explaining Guardian's decision on Pak's claim. *See* Oppo. at 18:28-19:6 (citing Bourhis Decl., Ex. Z at 37:1-38:2, 151:17-154:2, 290:4-16). But this does not prove that Guardian *ignored* those letters in investigating Pak's claim. Moreover,

13

Moreover, several pieces of evidence confirm that Guardian in fact reviewed the opinions of his treating physicians, Drs. Sachdev and Walia. A November 10, 2020, letter from Guardian to Pak's attorney stated that a consulting physician had reviewed Walia's report. *See id.*, Ex. V. Similarly, Guardian stated in a July 2, 2020, letter to counsel that a consulting physician had spoken with Sachdev on the phone.[3] *See id.*, Ex. R. Additional evidence proffered by Guardian shows that it reviewed several progress notes that Sachdev submitted over the course of Guardian's investigation of Pak's claim. *See* MSJ, Kelly Decl., Ex. 10. It can hardly be said that Guardian ignored the opinions of Pak's treating physicians when the record explicitly references those opinions multiple times.

Nor did Guardian misrepresent those physicians' opinions. Pak contends that Guardian falsely stated in its denial letter that Sachdev "provided no medical restriction or limitation that would preclude Dr. Pak from the practice of pediatric anesthesia" when in fact he "provided several restrictions and limitations" that preclude both pediatric and general anesthesia. Oppo. at 19:7-16 (citing in part Bourhis Decl., Ex. R). Again, Pak overstates the evidence. Guardian acknowledged that Sachdev "was supportive that Dr. Pak's impairment would restrict and limit his ability to work long hours or take night call." *See* Bourhis Decl., Ex. R. But nothing in Sachdev's initial letter to Guardian (which Pak referenced in response to Guardian's denial of his claim) specifically stated that he was unable to practice pediatric anesthesiology. *See id.*, Exs. I, S. Rather, he suggested that Pak limit his hours of work. *See id.*, Ex. I. Moreover, Guardian told Pak that a consulting physician spoke with Sachdev, reviewed Pak's medical records, and determined that although he had a "reduced ability to work," there was nothing "which would specifically

---

given the volume of materials that Guardian had in reviewing Pak's claim, it is not unreasonable that Guardian did not cite two, one-page letters in its decision letter.

[3] This same evidence counters Pak's argument that Guardian did not thoroughly investigate his claim because it "failed to conduct an independent medical evaluation" of him. *See* Oppo. at 22:4-9. Pak ignores the second half of the quote he cites in support, which states that an insured does not thoroughly investigate a claim "if it fails to have the insured examined by a doctor of its choice *or at least to consult with the insured's treating physician.*" *See id.* (citing *Wilson v. 21st Century Ins. Co.*, 38 Cal. Rptr. 3d 514, 518 (2006)). In any case, the California Supreme Court later clarified that "stating a general rule as to how much or what type of investigation is needed . . . is difficult," and that instead, an insurer's "good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." *Wilson*, 42 Cal. 4th at 723.

preclude the practice of the subspeciality of pediatric anesthesia." *See id*., Ex. R.

The same is true for Walia's letter to Guardian. She did not, as Pak asserts, restrict Pak from practicing pediatric anesthesiology. *See id*. at 19:17-21 (citing Bourhis Decl., Exs. U, V). Instead, she stated that she "would not recommend Dr. Pak engage in his duties as an anesthesiologist *when he is experiencing cluster headaches*." *See id.*, Ex. U (emphasis added). Pak may disagree with Guardian's assessment of his physicians' statements, but that does not mean that Guardian misrepresented what they said.

Finally, the evidence does not show that Guardian improperly relied on the ASA/CPT codes. *See* Oppo. at 21:24-22:3. The record indicates a lengthy, thorough investigation by Guardian into matters that remain in dispute. It repeatedly requested—and reviewed—additional information from Pak. *See, e.g.,* MSJ, Kelly Decl., Ex. 4 (requesting additional financial records and a list of procedures Pak was no longer performing, among other information); Oppo., Bourhis Decl., Ex. K (acknowledging receipt of pay stubs and asking for profit and loss statements). It consulted his doctors and reviewed their reports, including updated progress reports. *See* MSJ, Kelly Decl., Ex. 10. It looked at his financial statements. *See* Oppo., Bourhis Decl., Ex. R. The ASA/CPT codes were but one part of this investigation, which Guardian attests resulted in a review of over 2,000 pages of documents. *See* Reply at 13:17. The nature of the investigation—including the parties' disagreement over Pak's occupation (which remained in dispute until the litigation of this motion)—shows that any delay in rendering a decision by Guardian was reasonable, as does evidence showing that Pak delayed providing certain records that Guardian needed to make its decision. *See* MSJ, Kelly Decl., Ex. 9.

Pak may disagree with Guardian's conclusion. But that disagreement does not mean that Guardian's investigation was so insufficient that it breached the covenant of good faith and fair dealing. There is no genuine dispute of material fact here; the evidence presented—including that by Pak—shows that Guardian's investigation was reasonable, fair, and thorough.

Guardian's motion for summary judgment is therefore GRANTED on the good faith and fair dealing claim.

### III. PUNITIVE DAMAGES

Because only the breach of contract claim remains, Pak cannot recover punitive damages as a matter of law. *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1571 (2022) ("punitive damages are generally not available for breach of contract"); *In re Late Fee & Over-Limit Fee Litig.*, 741 F.3d 1022, 1026 (9th Cir. 2014) ("punitive damages are generally not recoverable for breach of contract unless the conduct constituting the breach is also a tort"). And it is worth adding that Pak has proffered no evidence showing that Guardian engaged in "oppression, fraud, or malice" as required to recover punitive damages. *See* Cal. Civ. Code § 3924(a). He contends that Guardian "avoided paying the benefits owed in a despicable manner," knowing that he was "in financial duress, that he suffered from a condition people often commit suicide over, and that its claim denial forced him to continue working in the medical field during a dangerous pandemic." Oppo. at 24:12-24. In support, he cites a letter that he wrote to Guardian. *See id.*, Bourhis Decl., Ex. O. This does not create a genuine dispute of fact over any oppression, fraud, or malice by Guardian. Instead, the record shows that Guardian conducted a thorough, reasonable investigation into Pak's claim.

Therefore, summary judgment is GRANTED on the punitive damages claim.

### CONCLUSION

Guardian's motion for summary judgment is DENIED with respect to the breach of contract claim and is otherwise GRANTED.

**IT IS SO ORDERED.**

Dated: August 19, 2022

William H. Orrick
United States District Judge